NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| CLAYTON WEBSTER, | |
| Petitioner, | Civil Action No. 10-5640 (DRD) |
| v. | **OPINION** |
| MICHELLE R. RICCI et al., | |
| Respondents. | |

This matter comes before the Court upon Petitioner's submission of two statements reflecting his current position, and Respondents' filing of two position statements and, in addition, the record of Petitioner's state proceedings.[1]

---

[1] Respondents' first statement was filed in response to the Court's order directing detailed listing of all dates relevant to Petitioner's state proceedings, while Petitioner's first statement was filed in response to the Court's order directing an explanation as to the incongruence in Petitioner's statements asserted before this Court and the Court of Appeals.  See Docket Entries Nos. 23-24 and 26-28.  Respondents' second statement and the underlying record were filed in response to the Court's order directing additional clarifications as to the time line of Petitioner's state proceedings and the directive to produce the record without making any substantive arguments.  See Docket Entries Nos. 29-43.  Respondents duly complied with the Court's directive, merely reiterating their prior position that the Petition was untimely.  See Docket Entries Nos. 30-43. Petitioner moved for on opportunity to traverse to his state court record and for extension of time to do so.  See Docket Entry No. 44. While the Court was not entirely clear as to how could Petitioner traverse to his state court record, the Court, out of abundance of caution and being mindful of Petitioner's pro se litigant status, granted Petitioner's request.  See id.  Correspondingly, Petitioner's traverse, operating effectively as his second position statement and a certain supplemental underlying record, was filed.  See Docket Entry No. 45.

In light of these statements, the record docketed prior and that recently filed by Respondent and supplemented by Petitioner, this Court will dismiss the Petition with prejudice, as untimely, and will decline to issue a certificate of appealability.

## I.    BACKGROUND

Since the background of this matter is somewhat convoluted, the Court finds it warranted to state the same in detail.

On October 29, 2010, Petitioner commenced the instant matter by filing his Petition under 28 U.S.C. § 2254.  See Docket Entry No. 1.  The Court issued Petitioner a Mason notice and, in addition, directed Respondents to file a limited answer to the Petition.  See Docket Entry No. 2.  Specifically, Respondents were directed to address only two aspects, namely, timeliness and exhaustion.[2]  See id.  Respondents filed their limited answer, and Petitioner traversed.  See Docket Entries Nos. 5-11 and 13.

At the time when Petitioner filed his Petition and submitted his traverse to Respondents' limited answer, Petitioner claimed that his first post-conviction relief ("PCR") application was submitted to the state courts on May 8, 2000,[3] and dismissed,

---

[2] The record filed by Respondents showed that the Petition at bar is a "mixed" pleading containing exhausted and unexhausted challenges.  However, the Court's analysis now is limited solely to the issue of timeliness, and the issue of exhaustion need not be reached in light of the Petition being untimely.

[3] Petitioner also alleged that he had attempted to submit a PCR application on February 18, 2000, but he conceded that such application had never reached the state courts and, thus, it

without prejudice to his filing of his second PCR application, on March 20, 2001. See Docket Entry No. 1, at 9. He also asserted that his second PCR application was initially filed pro se on June 27, 2001, and his counseled application and the brief perfecting the same were filed with the state court on May 22, 2002. See Docket Entry No. 13, at 3.

The Court, thus, adopted Petitioner's March 20, 2001, date of dismissal of his first PCR application and, correspondingly, dismissed his Petition as untimely, solely on the basis of that date and without reaching any other issue. See Docket Entries Nos. 14 and 15. Having his Petition so dismissed, Petitioner did not assert to this Court that the March 20, 2001, date, that is, the date which he alleged and upon which date this Court relied, was incorrect and differed from the actual date of dismissal of his first PCR application. See, generally, Docket. Rather, he appealed this Court's dismissal of his Petition to the Court of Appeals.

This Court is not in privy with the factual allegations Petitioner raised on appeal. However, it appears that he alleged that his first PCR application was *not* dismissed by the state court on the March 20, 2001, since the Court of Appeals issued a mandate stating:

---

neither had nor could have had any legal effect.

Page 3 of 36

> [The Court of Appeals'] record contains evidence
> that the first PCR petition was dismissed [not on
> March 20, 2001, but] by order dated June 28, 2001,
> and [if the Court of Appeals were to hypothesize
> that Petitioner's] second PCR petition [actually
> triggered the statutory tolling] on June 27, 2001
> [rather than on May 22, 2002], then no time
> elapsed between the two PCR [proceedings].

Docket Entry No. 22, at 1-2.

Therefore, the Court of Appeals remanded this matter to this Court for further review. See id. at 2.

Pursuant to the Court of Appeals' mandate, this Court directed the Clerk to reopen this action and ordered both parties to re-state their factual positions. See Docket Entry No. 23. The filings listed supra, see this Opinion, note 1, were submitted in response. They showed that Respondents' position has remained the same, i.e., that the Petition was untimely. Petitioner, however, argued that his Petition was timely, since he has now asserted that the state court dismissed his first PCT application on a date other – and later – than March 20, 2001.

## II. THE PARTIES' FACTUAL POSITIONS AT THE INSTANT JUNCTURE

### A. Petitioner's Position

#### 1. Petitioner's Time Line of Events

Petitioner's position now yields the following time line:

1. September 18, 1995: Petitioner was convicted and sentenced.[4]

---

[4] Petitioner was charged and convicted of murdering a certain Jose Sanches. See Docket Entry No. 1-2, at 16. Petitioner did not deny committing that offense, which occurred when he had an altercation with Sanches and two other men. See

2. February 3, 2000: the Supreme Court of New Jersey denied certification as to his direct appellate challenges. No writ of certiorari was sought.

3. May 8, 2000: Petitioner submitted his first PCR application.

4. March 20, 2001: the Law Division issued a letter-order notifying Petitioner's counsel and the prosecutor that the first PCR application was dismissed. That letter-order also included a directive to the prosecutor to submit a formal order form commemorating that ruling. Petitioner, however, now maintains that this letter-order did not terminate his first PCR proceeding, and it continued pending.

5. June 27, 2001: although no formal order form was issued thus far, Petitioner, acting on the basis of the mandate stated in the letter-order (which provided for a non-prejudicial dismissal), submitted his second PCR application.

6. June 28, 2001: the prosecutor submitted a formal order form commemorating the ruling entered by the means of the letter-order, and that formal order form was issued. Petitioner

---

id. Rather, he contended that these men were "disrespectful" to him and harassed him verbally and, on the day of the murder, he became "annoyed" hearing these men's voices over the intercome. See id. at 17-19. Experiencing, allegedly, a "heightened anxiety" as a result of hearing the voices over the intercome, Petitioner shot the victim. Id. at 18-19. Later on, Petitioner came to believe that his emotions provided his defense counsel with a basis to pursue "a diminished capacity defense," but his counsel violated his Sixth Amendment rights by failing to assert such defense. Id. at 20.

now maintains that his first PCR proceeding must have been terminated only upon the issuance of that formal order form.

7.  May 22, 2002: Petitioner's PCR counsel filed a counseled application (and a brief perfecting the same) in connection with Petitioner's second PCR application.

8.  October 8, 2009: the Supreme Court of New Jersey denied certification as to Petitioner's last, by then already third, PCR application. No writ of certiorari was sought.

9.  September 30, 2010: Petitioner submitted his instant Petition to his prison officials for mailing to this Court.[5]

See Docket Entry No. 28, at 1-4.

### 2. Petitioner's Other Factual Assertions

In response to this Court's directive to clarify: (a) why Petitioner asserted, initially, that his first PCR was dismissed by the state courts on March 20, 2001, rather than on June 28, 2001, as he maintains now; and (b) why he elected to submit his second PCR on June 27, 2001, if – as he maintains now – his first PCR proceeding was remained pending and still continued to be unresolved as of June 27, 2001, Petitioner filed and relied upon an affidavit of a certain James Martin ("Martin"), who averred to the following:

---

[5]     That means Petitioner waited *eleven months and twenty two days* to file the Petition at bar after the New Jersey Supreme Court denied him certification as to his last PCR application.

1.  Martin was an inmate who performed paralegal services at the facility of Petitioner's confinement and assisted Petitioner with preparation of all Petitioner's legal submissions.

2.  Specifically, starting from April 2000, Martin assisted Petitioner with preparation of Petitioner's first PCR application and with all his following PCR submissions.

3.  During the year following Petitioner's submission of his first PCR application, Martin – acting on Petitioner's behalf and with Petitioner's full knowledge and consent – swiftly got in constant contact with Petitioner's PCR counsel and the Law Division judge presiding over Petitioner's first PCR proceeding.

4.  Specifically, acting on Petitioner's behalf, Martin called that judge and was informed about the issuance of the letter-order which dismissed Petitioner's first PCR application without prejudice to Petitioner's commencement of his second PCR proceeding.

5.  Martin informed Petitioner of that ruling and, acting upon Petitioner's directive, submitted Petitioner's second PCR application on June 27, 2001, without waiting for the entry of any formal order form commemorating the ruling made in the letter-order.

See Docket Entry No. 28, at 15-16; see also Docket Entry No. 45-1, at 2 (Petitioner's letter to the public defender representing

him during his second PCR proceeding, in which Petitioner stated that he got in contact with the judge presiding over his first PCR proceeding within just a few months after it commenced).

## B.   Respondents' Position

Respondents supplemented Petitioner's assertions with the record establishing the following:

1.   Petitioner's first PCR application was "received and recorded" by the Law Division on May 8, 2000.

2.   On March 20, 2001, that is on the very date when the Law Division judge issued the letter-order ruling that Petitioner's first PCR proceeding was dismissed without prejudice to commencement of second PCR proceeding, the state court system terminated Petitioner's first PCR proceeding for the purposes of all state court records.[6]

3.   On June 27, 2001, a certain legal document was mailed by Petitioner to the Superior Court of New Jersey; that document was likely Petitioner's second PCR application submitted by Martin on Petitioner's behalf.

4.   On July 2, 2001, the Superior Court of New Jersey, Law Division, duly recorded receipt of Petitioner's second PCR application.

---

[6] Nothing in the record suggests that Petitioner's first PCR proceeding was reopened by the state courts for the purposes of entering the formal order form commemorating the ruling made in the letter-order, and Petitioner never asserted such reopening.

Page 8 of 36

5.  On May 22, 2002, Petitioner signed a counseled version of his second PCR application and a brief perfecting the same, although neither one of these documents has any markings indicating that they were received by the state courts.

6.  On October 20, 2003, the Law Division judge denied Petitioner's second PCR application orally, in open court; a transcript of that proceeding reflected that ruling.  A written order commemorating the same was entered on October 28, 2003.

7.  On January 7, 2004, Petitioner filed his notice of appeal with the Appellate Division.

8.  On July 1, 2004, that appeal was perfected upon receipt of Petitioner's brief.[7]

9.  On May 16, 2005, the Appellate Division issued a decision affirming denial of PCR as to Petitioner's second application.

10.  The Supreme Court granted certification on November 17, 2005.[8]

---

[7] Petitioner's own submission verifies that he was fully aware that each of his PCR submissions had to be perfected at each level of state courts.  See Docket Entry No. 45-1, at 10.

[8] There is no information in the record as to when Petitioner sought certification with regard to the Appellate Division's affirmance.  The sole piece of information this Court has is Petitioner's letter dated May 26, 2005, and addressed to Petitioner's PCR counsel; that letter verifies that Petitioner was well aware of all filing deadlines under the state law.  See Docket Entry No. 45-1, at 13.

Page 9 of 36

11.  On November 30, 2005, the Supreme Court of New Jersey
     limited the scope of its review to the narrow issue of
     whether Petitioner's PCR counsel was obligated to raise all
     claims Petitioner desired to raise, regardless of whether
     Petitioner's PCR counsel perceived those claims as
     meritorious or wholly frivolous.

12.  On July 12, 2006, the Supreme Court of New Jersey remanded
     Petitioner's PCR proceedings with a directive that the Law
     Division would consider all issues Petitioner wished to
     assert, regardless of the merit perceived by his counsel.[9]

13.  On February 15, 2007, Petitioner filed his third PCR
     application for the Law Division's review.[10]

14.  On May 1, 2007, the Law Division dismissed Petitioner's
     third PCR application.

15.  On June 29, 2007, Petitioner filed his notice of appeal with
     the Appellate Division.

16.  On May 23, 2008, Petitioner's appeal was perfected upon his
     filing of a brief in support of his third PCR application.

---

[9] The Supreme Court of New Jersey's *opinion*, included in the
record provided by Respondent, is silent as to when Petitioner
had to submit his third PCR application to the Law Division in
connection with that remand.  The record here does not include
the accompanying *order* issued by the Supreme Court of New Jersey.

[10] There is no information in the record as to when that
third PCR application was perfected.

Case 2:10-cv-05640-DRD Document 46 Filed 06/25/13 Page 11 of 36 PageID: 2349

17. On June 12, 2009, the Appellate Division affirmed denial of
    PCR as to Petitioner's third PCR application.

18. The Supreme Court of New Jersey denied certification on
    October 8, 2009.[11]

Docket Entries Nos. 26 and 30-43.

## III. STATUTORY TOLLING CONSIDERATIONS

### A. General Overview

On April 24, 1996, Congress enacted Anti-Terrorism and
Effective Death Penalty Act ("AEDPA"), which provides that "[a]
1-year period of limitation shall apply to an application for a
writ of habeas corpus by a person in custody pursuant to the
judgment of a State court." 28 U.S.C. § 2244(d)(1). The
limitations period starts to run from "the date on which the
judgment became final." 28 U.S.C. § 2244(d)(1). A state-court
criminal judgment becomes "final" within the meaning of §
2244(d)(1) by the conclusion of direct review or by the
expiration of time for seeking such review, including the 90-day
period for filing a petition for writ of certiorari in the United
States Supreme Court. See Swartz v. Meyers, 204 F.3d 417, 419
(3d Cir. 2000); Morris v. Horn, 187 F.3d 333, 337 n.1 (3d Cir.
1999); U.S. Sup. Ct. R. 13.

---

[11] As with Petitioner's other applications for certification,
the record before this Court is silent as to the date when
Petitioner moved for certification. The record is also void of
any information when that application was perfected.

Section 2244(d)(2) requires statutory tolling for "[t]he
time during which a *properly filed* application for State post-
conviction or other collateral review with respect to the
pertinent judgment or claim *is pending*," 28 U.S.C. § 2244(d)(2)
(emphasis supplied), provided that the application to the state
court seeking collateral review was filed during the federal
habeas period of limitations.[12]  Thus, the process of evaluating
the timeliness of a § 2254 petition requires, inter alia, a
determination of when an application for state post-conviction
relief was both "properly filed" and "pending."

>    An application is "[merely] filed," as that term is
>    commonly understood, when it is delivered to, and
>    accepted by the appropriate court officer for placement
>    into the official record. [In contrast,] an application
>    is "properly filed" when its delivery and acceptance
>    are in compliance with the applicable laws and rules
>    governing filings.  . . . [T]he question whether an
>    application has been "properly filed" is quite separate
>    from the question whether the claims contained in the
>    application are meritorious and free of procedural bar.

Artuz v. Bennett, 531 U.S. 4, 8-9 (2000) (citations omitted).

### B.  Effect of Out-of-time and Not Perfected Filings

For the purposes of calculating a litigant's period of
limitations, the word "pending" and the phrase "properly filed"
are terms of art having a technical meaning qualitatively
different from that a layperson may perceive reflecting solely on

---

[12]  A litigant's filing of a PCR application after the
litigant's AEDPA-based limitations period expires cannot aid the
litigant.  See Long v. Wilson, 393 F.3d 390, 394-95 (3d Cir.
2004); Schlueter v. Varner, 384 F.3d 69, 78-79 (3d Cir. 2004).

the dates when the first document is mailed to the trial court and when the highest court issues its ruling. See Jenkins v. Superintendent of Laurel Highlands, 705 F.3d 80 (3d Cir. 2013). Rather, under the regime ensuing from Artuz v. Bennett and Evans v. Chavis, 546 U.S. 189 (2006), the tolling cannot apply:

(1)   starting from the point in time when, under the state law, an inmate's time to appeal denial of PCR (or to seek certification as to afformance of such denial) expires and until the point in time when the inmate's application to file such appeal out of time (or to seek such certification out of time) is granted,[13] see Jenkins, 705 F.3d at 86-88 and nn.6 and 8; and, in addition,

(2)   starting from the point in time when a not-perfected PCR application to the Law Division (or an appeal to the Appellate Division as to denial of PCR, or an application for certification as to affirmance of denial of PCR) was received/recorded by the state courts and until the point in time when the inmate's submission is duly perfected under the requirements posed by the state law.[14]   See id. at 88,

---

[13] Pursuant to New Jersey Court Rule 2:4-1(a), the time for filing a notice of appeal is forty five days. A petition for certification must be filed with the Supreme Court of New Jersey within twenty days from the date of the Appellate Division's adverse ruling.   See N.J. Ct. R. 2:12-3.

[14] Under the New Jersey law, an inmate's PCR application is perfected when the inmate files a brief in support of it. See, e.g., State v. Clement, 2012 N.J. Super. Unpub. LEXIS 2550, at *4

n. 11 ("[W]e note that [the inmate's PCR submission] was not
properly filed [within the meaning of Artuz] until he
perfected it").[15]

### C.    The Petition Is Untimely Under the Statutory Tolling

Central to this Court's calculations is the fact already
mentioned supra, i.e., that Petitioner, being well aware of and
carefully monitoring each and every development that took place
during his three rounds of PCR proceedings, nonetheless waited
eleven months and twenty two days to file his Petition at bar
after the New Jersey Supreme Court denied him certification as to
his last, that is, third PCR application.[16]

_____

(N.J. Super. Ct. App. Div. Nov. 20, 2012) ("Defendant failed to
perfect her . . . PCR petition because she did not file a brief
in support of the petition") (citing N.J. Ct. R. 3:22-8).  Here,
Petitioner was well aware of that requirement since the record
reflects: (a) Petitioner's letters to his PCR counsel so stating;
and (b) the letter-order issued by the Law Division, where
Petitioner's first PCR was expressly dismissed for failure to
perfect.

[15] This Court is mindful of a subtle distinction between the
PCR regimes in New Jersey and Pennsylvania (where an application
for certification to the Supreme Court is deemed a new "pleading"
rather than an appellate application).  However, this is a
distinction without difference.  See Knight v. Lagana, USCA No.
13-1590 (June 14, 2013) (affirming dismissal of a § 2254 petition
filed by a prisoner whose petition was untimely under the regime
summarized in Jackson even though the untimeliness in Knight
ensued from the cumulative effect of temporal gaps accruing as a
result of out-of-time filings made in the Appellate Division and
in the New Jersey Supreme Court).

[16]   Unlike in calculation of the point in time when the AEDPA
period is triggered, i.e., when the conviction becomes final upon
conclusion of direct appeal, including ninety days to seek
certiorari from the Supreme Court of the United States, no

Since Petitioner waited eleven months and twenty two days to file his Petition, his use of more than just eight days of his one-year AEDPA limitations period prior to or during any stage of his three rounds of PCR proceedings would necessarily render his Petition untimely (that is, unless he qualifies for equitable tolling). And, since there is no dispute that he used four days of his AEDPA period in May 2000 (that is, after his conviction became final on May 4, 2000, but before he filed his first PCR application on May 8, 2000), Petitioner's use of *more than just four days* of his AEDPA period during his three rounds of PCR proceedings would render his Petition untimely, save for equitable tolling considerations. Thus, the Court examines the record through the prism of such "four days maximum" inquiry.

### 1. State Court's Issuance of a Letter-Order

Since Petitioner's now-assumed position – and, seemingly, the position he asserted before the Court of Appeals when he appealed this Court's initial dismissal of his Petition as untimely – turns on his recently developed claim that his first PCR application was dismissed only upon the Law Division's issuance of the formal order form dated June 28, 2001, and the Law Division's issuance of the letter-order dated March 20, 2001,

---

ninety-day period to seek certiorari is added to calculation of the point in time when a litigant's AEDPA period re-triggers upon denial of certification by the state's highest court. <u>See</u> <u>Lawrence v. Florida</u>, 549 U.S. 327 (2007); <u>Stokes v. Dist. Att'y of County of Phila.</u>, 247 F.3d 539, 542 (3d Cir. 2001).

had no dismissal effect, see Docket Entry No. 28 and 45; see also Docket Entries Nos. 36-2 and 36-5, the logical point to start this Court's discussion is that contention.

The letter-order at issue was addressed to both the prosecutor representing the State during Petitioner's first PCR proceeding and to the public defender representing Petitioner in that action. See Docket Entry No. 36-2. That letter-order included: (a) the seal of the Superior Court of New Jersey; (b) the designation of the particular division and vicinage of the Superior Court of New Jersey where Petitioner's first PCR proceeding was commenced and adjudged; (c) the address of the courthouse; (d) the presiding judge's physical signature; (e) the judge's name and official title; (f) the date of the issuance; (g) the names of the parties to the suit; (h) the index of that matter; (i) the PCR nature of the proceeding; and, paramount, (j) the unambiguously adjuratory language stating, with utilization of the present tense of the verb "is": "the matter is dismissed." See id. (emphasis supplied). Acting upon that directive, the state courts closed Petitioner's case on the very day when the letter-order was issued, and their docket system so reflected.

The formal order form included: (a) the letterhead of the prosecutor; (b) the designation of the Division and vicinage of the Superior Court of New Jersey; (c) the presiding judge's physical signature; (d) the judge's name and official title; (c)

the date of the issuance; (e) the names of the parties to the suit; (f) the index of that matter; (g) the date of the issuance; and (h) a statement commemorating the ruling made in the letter-order and clarifying why Petitioner's first PCR proceeding was terminated: "Defendant not having perfected his application for post conviction; it is on this day . . . ordered that the application for post conviction relief is hereby dismissed." Docket Entry No. 36-5.[17]

It is well-settled that "[c]ourts must speak by orders and judgments, not by opinions, whether written or oral, or by chance observations or expressed intentions made by courts during, before or after trial, or during argument." New Castle County v. Hartford Accident & Indem. Co., 933 F.2d 1162, 1204 (3d Cir. 1991). However, the issue of what type of a document qualifies as an "order" is qualitatively different from this basic point.

Although [presenting] an unusual method of disposition, [a letter-order] is [a] final order [conferring upon the litigant all legal rights ensuing from the entry of a final orders. Here, we have a scenario where the

_____

[17] Notably, the formal order form was wholly silent as to whether the dismissal of Petitioner's first PCR application was with or without prejudice. Thus, the sole and only source of Petitioner's right to file his second PCR application without risking a procedural bar was the above-discussed letter-order which expressly provided for dismissal without prejudice, and Petitioner systemically relied upon *that* language for the purposes of all his following proceedings in the state courts, invariably treating that letter-order as a conclusive ruling entered as to his first PCR application. See, e.g., Docket Entry No. 45-1, at 4 (Petitioner's letter to his PCR judge, reading, "[Y]ou dismissed my initial petition for PCR without prejudice").

> district] court's letter . . . addressed [the
> defendant's application] and declined to grant relief.
> . . .   The corresponding docket sheet entries [made by
> the clerk of the court's office], reflect . . . that
> the letter was sent to [the defendant], and . . . that
> the letter "terminated" [the defendant's action.   In
> addition,] the text of the letter makes clear that the
> court was denying relief.   Neither party was . . .
> misled or prejudiced by the disposition. [Therefore,
> that letter operated as a final order.]

United States v. Flemons, 277 F. App'x 367, 368-69 (5th Cir.

2008).

Thus, a written statement from the court qualifies as an

"order" if that statement adjudicates an actual issue in the

action and provides a sufficient notice to the parties as to the

disposition reached with regard to that adjudged issue.   In other

words, to be deemed an actual "order," that "'order' must be

final, but [it] need not be a formal order . . . .   [Rather, the

'order'] must impose an obligation, deny a right, or fix some

legal relationship." Aerosource, Inc. v. Slater, 142 F.3d 572,

578 (3d Cir. 1998); compare Speaks v. Brierley, 417 F.2d 597,

600-01 (3d Cir. 1969) ("Something more is needed than a few words

of unrecorded talk between a judge and a prothonotary. . . .

[A]ny . . . judgment[] is construed in its entirety according to

the usual canons of construction . . . so as to give effect to

the intent of the . . . court") (quoting, inter alia, Hill v.

Wampler, 298 U.S. 460, 465 (1936)).[18]

_____

[18] See also Bell v. Thompson, 545 U.S. 794, 804 (2005) (the
test for what constitutes an order does not turn on the issuance

True, some modes of interaction between the court and the parties (for instance, for instance, oral utterances, hearing transcripts, or electronic transmissions) differ so dramatically from written adjudicatory instruments (or fail to give a due notice to both parties) that they cannot qualify as "orders." See, e.g., United States v. Starnes, 501 F. App'x 379, 386(6th Cir. 2012) ("An ex parte, private email was not [a] sufficient [order because it] fail[ed] to provide the defendant with adequate notice"); Marshall v. City of Farmington Hills, 479 F. App'x 661, 664 (6th Cir. 2012) ("[T]he ruling must be expressed in a written order, not an oral pronouncement") (citation and quotation marks omitted); United States v. Penney, 576 F.3d 297, 204 (6th Cir. 2009) (courtroom minutes, while reduced to a writing, cannot operate as an actual order); Omnipoint Holdings, Inc. v. City of Southfield, 355 F.3d 601, 606 (6th Cir. 2004) ("[A] formal resolution is a writing separate from the hearing record"). In contrast, a written adjudicatory instrument resolving an issue before the court and giving both sides due

_____

of a formal mandate; rather, the question is whether the parties could reasonably act on the court's prior written statements in order to "assume that the [formal] mandate would-indeed must-issue"); In re Order Authorizing Installation and Use of Pen Register, 439 F. Supp. 2d 456, 458 (D. Md. 2006) ("Although informal, this letter constitutes an order of the court and shall be docketed accordingly"); accord United States v. Green, 532 F.3d 538 (6th Cir. 2008) (even oblivious terms of a sealed memorandum can qualify as valid order terms if they are incorporated into a later-issued order, regardless of the fact that the order was also sealed and no more specific).

notice operates as an "order," especially if it is consistent with the remainder of the record in the adjudicated case. Cf. Wampler, 298 U.S. at 461-62 (since, for the heightened purposes of criminal sentencing, "[t]he only sentence known to the law is the sentence or judgment entered upon the records of the court," clerk of the court's written statement is null and void if it differs from and alters the terms imposed orally by the judge); United States v. Coccia, 598 F.3d 293, 296 (6th Cir. 2010) ("A court speaks through its written orders and judgments, and where, as here, such a judgment is consistent with the record of the proceedings, there is no reason [to find that order invalid]"); Richmond, F. & P. R. Co. v. Brotherhood of Maintenance of Way Employees, 795 F.2d 1161, 1167 (4th Cir. 1986) (a court's statement qualifies as an order where there is "some kind of tangential substantial alignment" between the terms of the statement and the record).

Here, it would be anomalous to treat the Law Division's letter-order (expressly dismissing Petitioner's first PCR proceeding) as anything but the final judgement in that matter: doing so would exalt form over substance. The letter-order contained every insignia of a final written mandate, being set forth in unmistakably adjudicatory, present-rather-than-future terms, and bearing every regalia of an adjudicatory instrument, such as the date, the name of the tribunal, the names of the

parties, the index, the judicial signature, etc. Moreover, it conclusively disposed of Petitioner's first PCR proceeding and duly put both parties on notice as to the resolution reached. Furthermore, all parties (including Petitioner) and the state court system relied upon that letter-order to treat Petitioner's first PCR proceeding as conclusively closed on the very date when the Law Division issued the letter-order. Correspondingly, Petitioner's first PCR proceeding terminated on that date, i.e., March 20, 2001, and his AEDPA period restarted its run when his time to appeal that termination expired. Therefore, even if this Court were to limit its analysis *solely* to the issue of the letter-order (and to ignore all other aspects of Petitioner's PCR proceedings), the Petition is necessarily untimely: by at least fifty days.[19]

_____

[19] Petitioner handed his prison officials a certain document for mailing to the Superior Court of New Jersey (which the Court presumes to be Petitioner's second PCR application) on June 27, 2001. Since the letter-order was issued on March 20, 2001, ninety nine days expired between March 20, 2001, and June 27, 2001. If the Court were to presume that Petitioner's AEDPA period remained statutorily tolled for forty five days after March 20, 2001, under New Jersey Court Rule 2:4-1(a) (since Petitioner could have appealed the Law Division's dismissal of his first PCR application), these forty-five day have to be subtracted from this ninety-nine day period. That leaves the Court with fifty four days. As noted supra, the Petition would be timely within the meaning of statutory tolling had Petitioner used only four days of his AEDPA period during or in between his three rounds of PCR proceedings. He, however, used fifty four days from the date of entry of the letter-order until his filing of his second PCR. Therefore, subtracting these four days from the fifty-four day period, the Court arrives at fifty days.

## 2. Petitioner's Out-of-time PCR Appeals

As detailed supra, the Court of Appeals in Jenkins and Knight clarified, inter alia, that the AEDPA period is not tolled starting from when an inmate's time to appeal the denial of PCR relief expires under the state law and until the inmate's application to file such appeal out of time is granted. Here, neither Respondents' record of Petitioner's underlying proceedings nor the supplement provided by Petitioner contains any information as to when Petitioner sought certification from the Supreme Court of New Jersey with regard to either his second PCR application or his third PCR application. Thus, out of abundance of caution, this Court will presume, without making a factual finding, that both certifications were sought within twenty days from the dates of issuance of the Appellate Division's adverse rulings, and will limit this Court's review to Petitioner's filings of PCR appeals with the Appellate Division.

Here, the Law Division denied Petitioner's second PCR application orally, in open court, on October 20, 2003. Since such oral ruling could not qualify as an order, and the fact that the transcript of Law Division's proceeding reflected such oral ruling changes none for the purposes of this Court's analysis, see Marshall, 479 F. App'x at 664; Penney, 576 F.3d at 204; Omnipoint Holdings, 355 F.3d at 606, Petitioner's time to appeal the denial of his second PCR application was triggered upon the

Page 22 of 36

issuance of the Law Division's written order, i.e., on October 28, 2003.  Forty-five days later, that is, on December 12, 2003, Petitioner's time to appeal expired, and his AEDPA period was re-triggered and remained running at least until Petitioner obtained leave to appeal nunc pro tunc.

The date when that such leave was issued is not in the record: all the Court knows is that Petitioner filed his *notice* of appeal with the Appellate Division on January 7, 2004.  Yet, it is self-evident that no leave to appeal nunc pro tunc could have been issued by the Appellate Division *prior* to that January 7, 2004, date, i.e., prior to Petitioner even informing the Appellate Division of his desire to seek appellate review. Correspondingly, at the very least, Petitioner's AEDPA period was running for twenty five days in connection with Petitioner's out-of-time appeal as to his second PCR application: from December 12, 2003, to January 7, 2004.  And, since - as noted supra - Petitioner's usage of more than four days of his AEDPA period at any time during or between his three rounds of PCR proceedings would render his Petition untimely, this twenty-five-day gap means that the Petition is untimely by, at least, twenty one days: that is if the Court were to focus *solely* on that out-of-time filing.

If the Court were to turn its attention to Petitioner's filing of appeal from the Law Division's dismissal of his third

PCR application, the Court would detect another period that renders the Petition untimely. Here, the record is again silent as to when the Appellate Division granted Petitioner leave to appeal nunc pro tunc. Correspondingly, the Court again presumes, without making a factual finding, that the Appellate Division granted such leave on the very day when Petitioner filed his notice of appeal.[20]

Since the Law Division dismissed Petitioner's third PCR application on May 1, 2007, and Petitioner filed his notice of appeal with the Appellate Division only on June 29, 2007, that is, fifty-eight days later (and thirteen days past the forty-five-day state-law limit, see N.J. Ct. R. 2:4-1(a)), it means that he used at least thirteen days of his AEDPA period in connection with that out-of-time filing. Since his usage of more than four days of his AEDPA period at any time during or between his three rounds of PCR proceedings would render his Petition untimely, this thirteen-day gap means that the Petition is untimely by at least nine days: that is if the Court were to focus *solely* on that other out of time filing.

Needless to say, if the Court were to add the twenty-one day untimeliness ensuing from the out-of-time appellate filing as to

---

[20] As with Petitioner's second PCR proceeding, it is self-evident that the Appellate Division could not have issued leave to file an appeal out of time prior to Petitioner's filing of notice to appeal, since the Appellate Division could not have known about Petitioner's interest in seeking appellate review.

Petitioner's second PCR proceeding to the nine day untimeliness ensuing from the out-of-time appellate filing as to Petitioner's Petitioner's third PCR proceeding, the Court would arrive at thirty days of untimeliness: that is *without* adding the fifty-day untimeliness ensuing from Petitioner's use of his AEDPA period after the entry of the letter-order, as discussed supra.[21]

### 3. Failure to Timely Perfect PCR Submissions

A litigant's failure to perfect his/her PCR filings at any level of the state court results in a continuous run of the AEDPA period while a PCR application is merely received/recorded but remains not perfected in accordance with the state law. See Jenkins, 705 F.3d at 88, n. 11 (explaining that a PCR "pleading was not properly filed [within the meaning of the AEDPA] until [the litigant] perfected [his/her pleading]").

Here, Petitioner's first PCR was *never* perfected; indeed, it was expressly dismissed on this very ground. Moreover, his second PCR application was perfected only on May 22, 2002: that is why the state courts expressly found that *this* May 22, 2002, date - rather than the date when Petitioner's not-perfected submission was merely received by the state courts - was the date when his second PCR application was actually filed. See State v.

---

[21] If the Court were to add the fifty-day untimeliness to the thirty-day untimeliness (ensuing from Petitioner's filing of out-of-time appeals during his second and third PCR proceedings), the Court would have to conclude that the Petition is untimely by eighty days.

Webster, 2009 N.J. Super. Unpub. LEXIS 1438, at *2 (N.J. Super.
Ct. App. Div. June 12, 2009) ("On May 22, 2002, [Petitioner]
filed a second PCR petition"). Analogously, Petitioner's appeal
as to his third PCR application was perfected only on May 23,
2008.[22]

Factoring aforesaid Petitioner's failures to perfect his
submissions into the Court's analysis, the Court arrives at the
following time line:

1.  February 3, 2000: the Supreme Court of New Jersey denied
    Petitioner certification as to his direct appellate
    challenges. Since no writ of certiorari was sought,
    Petitioner's AEDPA period was triggered on May 4, 2000.

2.  May 8, 2000: although Petitioner submitted his first PCR
    application, his AEDPA period kept running and no statutory
    tolling was ever triggered by that submission, since that
    application was never perfected.

3.  May 3, 2001, Petitioner's AEDPA period expired.

4.  June 27, 2001: Petitioner submitted what appeared to be his
    second PCR application. Since that application was also not
    perfected, the fact of that submission also did not trigger
    statutory tolling.

_____

[22] Since the record is silent as to when Petitioner perfected
his other PCR submissions, the Court would presume, without
making a factual finding, that each of them was perfected on the
very dates when the submission was made.

5.    May 22, 2002: Petitioner's second PCR application was
      finally perfected. Such perfection triggered the statutory
      tolling, but that trigger already could not affect the
      Petition at bar, since - by then - Petitioner's AEDPA period
      already expired more than a year ago.

6.    December 12, 2003: Petitioner time to appeal the Law
      Division's dismissal of his second PCR application expired.
      The statutory tolling ended; thus, Petitioner's AEDPA period
      restarted and kept running until Petitioner perfected his
      appeal on July 1, 2004, which restarted the tolling. During
      the aforesaid interim, the untimeliness of the Petition
      increased by additional two hundred and two days, hence
      reaching four hundred eighty six days.

7.    June 15, 2007: Petitioner's time to appeal the Law
      Division's dismissal of his third PCR application expired,
      and his AEDPA period restarted again and kept running until
      he perfected that appeal on May 23, 2008. Thus, the
      untimeliness of the Petition further increased by additional
      three hundred thirteen days, reaching the total of seven
      hundred ninety nine days.

8.    October 8, 2009: the Supreme Court of New Jersey denied
      Petitioner certification as to his third PCR application,
      and Petitioner's AEDPA period restarted one last time,
      halting its run on September 30, 2010, that is, when

Petitioner submitted the Petition to his prison officials for mailing to this Court. That last run added another three hundred twenty seven days, yielding the grand total of one thousand one hundred twenty six days. Which, in turn, means that – if every procrastination Petitioner allowed to happen would be factored in – his AEDPA period expired *seven hundred sixty one days* before he filed his Petition.

As the foregoing demonstrates, regardless of whether the Court focuses separately on the entry of the letter-order or on Petitioner's out-of-time PCR appeals, or on his failures to perfect his submissions, or if the Court focuses on the totality of circumstances, the Petition is patently untimely and must be dismissed on that ground, that is, unless Petitioner establishes that his Petition qualifies for equitable tolling. Therefore, the Court now turns its attention to equitable considerations.

## IV. EQUITABLE TOLLING CONSIDERATIONS

### A. General Overview

The Court already detailed to the parties the considerations relevant to the equitable tolling analysis. However, mindful of this decision being the Court's final disposition of this matter, the Court finds it warranted to recite the guidance it already provided so to compare and contrast the facts at hand with the circumstances where the equitable principle warrants substantive review of otherwise untimely habeas applications.

[T]he AEDPA statute of limitations is . . . subject to
equitable tolling. See Holland v. Florida, 130 S. Ct.
2549 (2010), Miller v. N.J. State Dep't of Corr., 145
F.3d 616, 618 (3d Cir. 1998). "A litigant seeking
equitable tolling bears the burden of establishing two
elements: (a) that he has been pursuing his rights
diligently, and (b) that some extraordinary
circumstance stood in his way." Pace, 544 U.S. at 418;
see also Holland, 130 S. Ct. 2549. Thus, a litigant's
excusable neglect cannot trigger equitable tolling.
See Merritt v. Blaine, 326 F.3d 157, 168 (3d Cir.
2003); Jones v. Morton, 195 F.3d 153, 159 (3d Cir.
1999). Rather, equitable tolling could be triggered
only when "the principles of equity would make the
rigid application of a limitation period unfair, such
as when a state prisoner faces extraordinary
circumstances that prevent him from filing a timely
habeas petition and the prisoner has exercised
reasonable diligence in attempting to investigate and
bring his claims." LaCava v. Kyler, 398 F.3d 271,
275-276 (3d Cir. 2005); see also Holland, 130 S. Ct. at
2562 (relying on Pace, 544 U.S. at 418). Moreover,
even where extraordinary circumstances do exist, "if
the person seeking equitable tolling has not exercised
reasonable diligence in attempting to file after the
extraordinary circumstances began, the link of
causation between the extraordinary circumstances and
the failure to file is broken, and the extraordinary
circumstances therefore did not prevent timely filing."
Brown v. Shannon, 322 F.3d 768, 773 (3d Cir. 2003)
(quoting Valverde v. Stinson, 224 F.3d 129, 134 (2d
Cir. 2000)).

Since a "garden variety claim of excusable neglect" by
a petitioner's attorney is not an extraordinary
circumstance warranting equitable tolling, Holland, 130
S. Ct. at 2564 (citations omitted), extraordinary
circumstances have been found only where: (a) the
respondent has actively misled the plaintiff, (b) the
petitioner has in some extraordinary way been prevented
from asserting his rights, (c) the petitioner has
timely asserted his rights mistakenly in the wrong
forum, see Jones, 195 F.3d at 159, or (d) the court
itself has misled a party regarding the steps that the
party needs to take to preserve a claim. See Brinson
v. Vaughn, 398 F.3d 225, 230 (3d Cir. 2005).

Therefore, extraordinary circumstance might result from such event as an attorney's abandonment of his/her client, but that abandonment *must occur in or directly affect* the very action with regard to which equitable tolling is sought. See Nara v. Frank, 264 F.3d 310 (3d Cir. 2001) (ordering evidentiary hearing as to equitable tolling where petitioner facing the death penalty was effectively abandoned by his lawyer), overruled on other grounds, Carey v. Saffold, 536 U.S. 214 (2002); see also Holland, 130 S. Ct. at 2565 (where attorney "failed to communicate with his client over a period of years, despite various pleas from client, and the failures seriously prejudiced a client who thereby lost what was likely his single opportunity for federal habeas review of the lawfulness of his death sentence," such gross misconduct might have constituted extraordinary circumstances); accord Seitzinger v. Reading Hosp. and Med. Ctr., 165 F. 3d 236, 237 (3d Cir. 1999) (equitable tolling was appropriate in Title VII case where "a diligent client persistently questioned the lawyer as to whether he had filed the complaint in time, and he affirmatively misrepresented to her that he had"). In addition, an attorney's neglect may qualify as an "extraordinary circumstance" only if such neglect is shown to be "egregious." See Holland, 130 S. Ct. at 2563 ("At least sometimes, professional misconduct could amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling"); Lawrence v. Florida, 549 U.S. 327 (holding that "counsel's mistake in miscalculating the limitations period" is not extraordinary circumstance warranting equitable tolling because, "if credited, this argument would essentially equitably toll limitations periods for every person whose attorney missed a deadline"); Johnson v. Hendricks, 314 F.3d 159, 160 (3d Cir. 2002) (an attorney's mistake in determining the petition's due date did not constitute extraordinary circumstances); Smith v. Gillis, 2004 WL 573957, at *3 (E.D. Pa. Mar. 4, 2004) (an attorney's failure to timely notify petitioner of the state court's decision affirming the dismissal of his petition was not an extraordinary circumstance).

For instance, in Holland, the Supreme Court found that the conduct of a federal habeas petitioner's attorney "may well be an 'extraordinary' instance in which petitioner's attorney's conduct constituted far more

than 'garden variety' or 'excusable neglect.'" <u>Id.</u> at 2564. There, the attorney:

> failed to file the petitioner's federal petition on time despite the petitioner's many letters that repeatedly emphasized the importance of his doing so. The attorney apparently did not do the research necessary to find out the proper filing date, despite the petitioner's letters that went so far as to identify the applicable legal rules. The attorney also failed to inform the petitioner's in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, again despite the petitioner's many pleas for that information. And the attorney failed to communicate with the petitioner's over a period of years, despite various pleas from the petitioner's that the attorney respond to his letters.

<u>Id.</u>

> Despite attorney's blatant disregard for the petitioner's interests, the petitioner's repeated efforts to have new counsel appointed – including contacting the state courts, their clerks, and the Florida Bar Association – were denied. <u>See id.</u> at 2565. When the petitioner ultimately discovered his AEDPA year had expired because of his attorney's abandonment, he prepared his habeas petition <u>pro</u> <u>se</u> and promptly filed it with the district court on the very day he learned that his AEDPA filing period had expired. <u>See id.</u> at 2553-56. On the basis of these facts, the Supreme Court found that further factual consideration was needed to determine: (a) whether the counsel's failure to timely file the habeas petition, to correctly determine the filing deadline, and to respond to the petitioner's many requests for information amounted to extraordinary circumstances within the meaning of the equitable tolling doctrine; and (b) whether the petitioner's actions showed due diligence as to his efforts to have his habeas petition timely filed. <u>See</u>, <u>generally</u>, <u>Holland v. Florida</u>, 130 S. Ct. 2549.

Docket Entry No. 14, at 20-23 (original emphasis, ellipses and

brackets omitted).

## B.   Additional Example Provided in *Jenkins*

Reflecting on the concept of equitable tolling and applying

it to the circumstances presented in Jenkins, the Court of

Appeals observed:

> We extend the remedy of equitable tolling "only
> 'sparingly,'" Urcinoli v. Cathel, 546 F.3d 269, 278 (3d
> Cir. 2008) (quoting Irwin v. Dep't of Veterans Affairs,
> 498 U.S. 89, 96 (1990)), "when 'principles of equity
> would make the rigid application of a limitation period
> unfair[,]'" Munchinski v. Wilson, 694 F.3d 308, 329 (3d
> Cir. 2012) (quoting Miller, 145 F.3d at 618). . . .
> Here, the [State] does not suggest that [the
> petitioner] has not been pursuing his rights
> diligently.  Such a contention would be untenable
> [because the petitioner] timely filed his: (1) notice
> of direct appeal; (2) [his] direct appeal; (3) PCR[]
> petition; (4) PCR[] notice of appeal; and (5) [his
> application for certification.  The petitioner] also
> perfected his pleading within thirteen days of the
> [state's] Supreme Court's issuance of its . . . notice
> [that the appeal was not perfected], and he filed his
> habeas petition [just] within ten days of [learning
> about the] denial of [certification].  In short, [the
> petitioner] has not been "sleeping on his rights[.]"
> Munchinski, 694 F.3d at 331 (quoting Mathis v. Thaler,
> 616 F.3d 461, 474 (5th Cir. 2010)).

Jenkins, 705 F.3d at 88-89 (footnotes omitted).

The Jenkins Court also clarified that:

> [a] diligent prisoner is one who "did what he
> reasonably thought was necessary to preserve his rights
> . . . based on information he received[.]"   Munchinski
> v. Wilson, 694 F.3d 308, 331 (3d Cir. 2012) (quoting
> Holmes v. Spencer, 685 F.3d 51, 65 (1st Cir. 2012)).  A
> prisoner must pursue his rights diligently "during the
> period [he] is exhausting state court remedies as well"
> as during the time he is pursuing a habeas petition.
> LaCava v. Kyler, 398 F.3d 271, 277 (3d Cir. 2005)
> (citing Jones v. Morton, 195 F.3d 153, 160 (3d Cir.
> 1999)).

Id. at 89, nn. 13 and 14.

## C. **Equitable Tolling Is Not Warranted in This Matter**

Here, Petitioner was in constant contact with his PCR counsel and the judges presiding over his PCR proceedings. He was appraised of every development that took place in his PCR actions, and his submissions verify that he was well aware of all filing deadlines ensuing from the operations of the state law and of his obligation to perfect each of his state court submissions. Analogously, he was well aware about the one-year AEDPA period governing the Petition at bar. Moreover, had he had any doubts, he could have commenced a Section 2254 proceeding eight years ago to obtain stay and abeyance of his federal petition at the time when his, then second out of his three, PCR application was on appeal before the Appellate Division, and preserve his right to seek federal habeas review until all three of his PCR proceedings completed. See Rhines v. Weber, 544 U.S. 269 (2005). He also could have filed a "protective" petition setting forth just some claims, see Pace, 544 U.S. at 416, and take advantage of the holding of Mason v. Meyers, 208 F.3d 414 (2000), that allows a § 2254 litigant both an opportunity and the time to withdraw such "protective" petition and file an all-inclusive petition in its place. And, indeed, he could have capitalized on the joint effect of Mason and Rhines to, first, file a "protective" petition and then have his all-inclusive petition stayed until a reasonable time after his PCR endeavors ended.

Page 33 of 36

He elected to do nothing.

Moreover, and crucially here, having his application for certification as to his third and last PCR application denied by the Supreme Court of New Jersey, he elected to sit on his rights for *eleven months and twenty two days*, effectively gambling that the fact of this eight-day difference between that period and the year measured out by the AEDPA would mask all other interims when his AEDPA period was running.[23] Such conduct presents a striking contrast to that examined in Holland and Jenkins, where litigants who had no information about the decisions reached by the state courts, filed their federal habeas petitions either on the very day they learned about the outcome of their state actions or just a few days later, and who met each of their state law filing deadlines and even perfected their abandoned-by-counsel state court applications in less than two weeks. Here, in light of Petitioner's blatant disregard for the consequences of his systemic and wilful laxness, this Court is constrained to deny him equitable tolling. See Munchinski, 694 F.3d at 331 (a litigant shall not be rewarded for "sleeping on his rights"). Finding otherwise would make a mockery of those litigants who did and do go through the very same state court process and yet meet

---

[23] The language of the mandate entered by the Court of Appeals upon Petitioner's challenge to this Court's initial dismissal of his Petition indicates that he made an analogous assertions to the Court of Appeals. See Docket Entry No. 22.

their deadlines or act with utmost diligence and promptness when faced with extraordinary circumstances in order to ensure the availability of substantive federal habeas review.[24]

Correspondingly, no equitable tolling is warranted in this matter, and the Petition will be dismissed for failure to meet the AEDPA statute of limitations requirements.

## V.   CERTIFICATE OF APPEALABILITY

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason

---

[24]   "A primary concern that dominates federal review of state court decisions is the need to respect the independence of state courts, and the finality of their judgments."  Morningstar v. Haney, 625 F. Supp. 2d 434, 452 (E.D. Ky. 2008).  "Under 28 U.S.C. § 2254, a federal court's power to review a state conviction is limited.  Habeas relief is available only where errors of a constitutional magnitude have occurred."  Jolly v. Gammon, 28 F.3d 51, 54 (8th Cir. Mo. 1994).  While the AEDPA ensures the rights of those litigants who diligently pursuing habeas relief rights in hope to correct such constitutional errors, nothing in the statute suggests that the narrow exception to the concept of finality of judgment created by habeas provisions should also be availed to those who sit on their rights.  Cf. McQuiggin v. Perkins, 133 S. Ct. 1924, 185 L. Ed. 2d 1019, 1030 (2013) (an inmate seeking habeas relief in a federal court six years after he obtained the affidavits which supported his claims could "not qualify for equitable tolling").  "[T]he doctrine of equitable tolling is centuries old, and dates from a time when the separation of the legislative and judicial powers was incomplete.  . . . It is hornbook law that limitations periods are customarily subject to equitable tolling, *unless tolling would be inconsistent with the text of the relevant statute*."  Id., 185 L. Ed. 2d at 1041-42 (Scalia, J., dissenting) (citations and quotation marks omitted, emphasis supplied).

could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322 (2003).

"When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, jurists of reason would not find it debatable that this Court was correct in its finding that the Petition is untimely. Accordingly, no certificate of appealability will issue.

## VI. CONCLUSION

For the foregoing reasons, the Petition will be dismissed with prejudice. No certificate of appealability will issue.

An appropriate Order accompanies this Opinion.

**Dickinson R. Debevoise**
United States District Judge

Dated: June 25, 2013